IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

SONNIEL R. GIDARISINGH,

                         Plaintiff,

      v.

TRAVIS BITTELMAN, RAYMOND
MILLONIG, JASON WITTERHOLT,
PATRICK HOOPER, KIM CAMPBELL,
BRIAN FRANSON, MICHAEL
JULSON, TIMOTHY CASIANA,
DONALD MORGAN, DENISE
VALERIUS, BRIAN NEUMAIER,
SANDRA HAUTAMAKI, ANTHONY
ASHWORTH, JANEL NICKEL,
TIMOTHY ZIEGLER, TIM DOUMA,
KEVIN BOODRY, and KELLY RICKEY,

                         Defendants.

OPINION AND ORDER

12-cv-916-wmc

---

       Plaintiff Sonniel R. Gidarisingh, an inmate at Columbia Correctional Institute proceeding *pro se*, alleges among other things that various employees of CCI violated his rights under the Eighth Amendment of the United States Constitution by failing to provide medical treatment and by physical assaulting him.   Before the court is defendants' motion for summary judgment on all claims.  (Dkt. #37.)  For the reasons that follow, the court will deny defendants' motion with respect to Gidarisingh's (1) excessive force claim and state law battery claim against defendants Travis Bittelman, Jason Witterholt and Kelly Rickey; (2) failure to protect claim against Brian Franson; and (3) conditions of confinement claim against defendants Brian Franson and Kelly Rickey. The court also declines to exercise supplemental jurisdiction on Gidarisingh's state law negligence claim, which will be dismissed without prejudice.  The court will also reserve

on plaintiff's First Amendment retaliation claim against defendant Bittelman.  In all other respects, the court will grant defendants' motion for summary judgment.

In addition to defendants' motion for summary judgment, there is also a renewed motion for assistance in recruiting counsel, which the court will grant.  In light of this decision, all remaining dates are suspended pending recruitment of counsel.

## UNDISPUTED FACTS[1]

### A. The Parties

Plaintiff Sonniel R. Gidarisingh is an inmate with the Wisconsin Department of Corrections ("DOC") and was confined at all times material to his lawsuit at Columbia Correctional Institution ("CCI").  CCI is a maximum-security institution located in Portage, Wisconsin.

Defendants are all current or former employees of the DOC and, for all times relevant to plaintiff's complaint, were assigned to CCI.  Defendants Travis Bittelman, Raymond Millonig, Brian Neumaier, Kelly Rickey, Jason Witterholt and Michael Julson were employed as Correctional Officers at CCI.  Bittelman and Millonig are no longer employed at CCI.  Neumaier, Rickey and Witterholt remain Correctional Officers at CCI.  Julson is now employed as a Correctional Sergeant at CCI.

---

[1] While plaintiff's claims cover a fairly sweeping factual landscape, defendants go well beyond the boundaries material to deciding their summary judgment motion by submitting extensive facts about Gidarisingh's past violent episodes and his psychological treatments.  Moreover, the court is skeptical that much of this would even be admissible at trial, either because of its lack of relevance, or if relevant, because of its prejudicial value.  With that said, the court finds the following facts material and undisputed unless otherwise noted.

Defendants Timothy Casiana, Brian Franson, and Donald Morgan are and were for all times material to the complaint employed at CCI as Supervising Officers 2 (Captains).[2]   Defendant Kevin J. Boodry was previously employed as a Supervising Officer 1 (Lieutenant) and is currently employed at CCI as a Supervising Officer 2 (Captain).  Defendant Patrick Hooper is a Correctional Sergeant at CCI.

At all times relevant to plaintiff's complaint, defendants Anthony Ashworth, Sandra Hautamaki and Timothy G. Ziegler were employed as Corrections Unit Supervisors at CCI.  Ashworth is currently employed as a Corrections Investigator for the Office of Special Operation.  Hautamaki is currently employed by the DOC as CCI's Deputy Warden.

Defendant Timothy Douma previously served as the Deputy Warden at CCI.  He is currently employed by the DOC as the Warden at New Lisbon Correctional Institution.  Defendant Janel Nickel was previously employed as the Security Director at CCI.  Defendants Kim M. Campbell and Denise Valerius are employed by the DOC at CCI as Nurse Clinicians 2.

### B.  Gidarisingh's GERD Diagnosis and Treatment

Gidarisingh represents that he was diagnosed with gastroesophageal reflux disease ("GERD") in 2006.  GERD is a digestive disorder that affects the lower esophageal sphincter, the ring of muscle between the esophagus and stomach.  Heartburn, also called

---

[2] Morgan currently serves as the Administrative Captain at CCI, but it is not clear if he served in that role at times relevant to this complaint.

acid indigestion, is the most common symptom of GERD.  In most cases, heartburn can be relieved through diet and lifestyle changes; however, some people may require medication or surgery.

At some point, Gidarisingh was prescribed pantoprazole, a proton pump inhibitor used to treat GERD.  That prescription was discontinued on or about March 14, 2012, after Gidarisingh attempted to commit suicide and was placed on a no medication protocol.

On June 5, 2012, Gidarisingh submitted a Health Services Request ("HSR"), complaining of severe chest pain and indicating that he did not know if it was a heart attack or GERD.  On June 6, HSU responded to the request, noting that Gidarisingh had been scheduled to be seen.  Defendants contend, however, that Gidarisingh refused to be seen that day.  Gidarisingh disputes this, claiming that he was never contacted about a medical appointment on the 6th.  There is no dispute, however, that Gidarisingh was seen by a nurse on June 11, 2012, for severe GERD.  At that time, Gidarisingh requested a prescription for pantoprazole but was denied that medication, and instead instructed to avoid spicy foods and not to lie down for two to three hours after eating.

On June 21, 2012, Dr. Dalia Suliene saw Gidarisingh for a renewal of selenium sulfide for an apparent fungus infection on his chest and back, as well as for GERD. Gidarisingh maintains that Suliene promised to reorder his GERD medicine, and the parties agree that she planned for him to have an esophagogastroduodenoscopy ("EGD")

test for erosive esophagitis.[3]   The next day, on June 22, Gidarisingh submitted another HSR, complaining that he was experiencing severe chest pain as if he were having a heart attack and requesting medical attention.  (Defs.' PFOFs (dkt. #56) ¶ 294.)   He further indicated that his GERD medication "was inappropriately discontinued."  (Id.)

### C.  June 23rd Incident

#### i.   Chest Pain Complaint

On June 23, 2012, Gidarisingh contends that he again complained of chest pains to defendants Bittelman, Witterholt and Millonig.  Gidarisingh submitted declarations from three inmates housed in DS-1 on that day, all of whom aver to his having asked these three defendants for requests for medical treatment.  Bittelman contends that he contacted HSU -- although he cannot recall with whom he spoke -- and was told that he should have Gidarisingh complete an HSR form or "blue slip."   From the HSU records from that day, it appears, as Gidarisingh contends, that Nurse Campbell was contacted. (Pl.'s Exhibits, Ex. 9B (dkt. #71-2) p.19.)   During a later interview as part of a DAI investigation, Campbell did not recall Bittelman contacting her about Gidarisingh's health complaint on June 23.   Gidarisingh disputes that Bittelman told him he should submit an HSR.   Neither Witterholt nor Millonig recall any complaints from Gidarisingh on June 23 about chest pains.

---

[3] An EGD is a "test to examine the lining of the esophagus, stomach, and first part of the small        intestine."        "Esophagogastroduodenoscopy,"        MedLine        Plus, http://www.nlm.nih.gov/medlineplus/ency/article/003888.htm (last visited Feb. 25, 2015).

### ii.   Exchange of Words

Around 1:00 p.m. on the 23rd, Gidarisingh spoke with Bittelman again about his medical concerns, eventually telling him that he was "going to file a complaint against him (Bittelman), COII Witterholt, Sgt. Millonig and Nurse Campbell for denying [him] medical attention." (Declaration of Sonniel R. Gidarisingh ("Gidarisingh Decl.") (dkt. #70) ¶ 47.) Gidarisingh claims that Bittelman responded, "[g]o ahead[,] you piece of shit," to which Gidarisingh responded by calling Bittelman a "racist honkey." (*Id.* at ¶¶ 48, 49.) Gidarisingh's version of this conversation is consistent with declarations submitted by inmates in neighboring cells. Bittelman acknowledges an "exchange of words," but his recollection is less precise, simply stating that Gidarisingh made "derogatory comments" to him, as well as other unit staff. (Affidavit of Travis Bittelman ("Bittelman Aff.") (dkt. #77) ¶ 7.)

### iii.   Physical Incident on the Way to Shower

At approximately 1:45 p.m. on the 23rd, Bittelman placed handcuffs on Gidarisingh and removed him from his cell for escort to the A-upper shower.[4] During the escort, Bittelman avers that Gidarisingh turned his body toward him and stated, "I'm gonna beat your -itch-ss for denying me medical treatment." (Bittelman Aff. (dkt. #77) ¶ 8.) Bittelman further contends that Gidarisingh turned toward him in an aggressive manner, making him fear that Gidarisingh was about to lash out and attempt to cause bodily injury. (*Id.* at ¶ 9.) Bittelman contends that he then "decentralized" Gidarisingh,

---

[4] According to Gidarisingh and other inmates in neighboring cells, Bittelman skipped other inmates who would normally be given the option to shower first before approaching Gidarisingh's cell to ask him whether he wanted a shower.

which is a process of securing an inmate on the floor to prevent further action on the inmate's part. (*Id.* at ¶ 10.) Bittelman further contends -- and the other defendants provide support -- that he suffered a small abrasion to his left elbow as part of this altercation.

Gidarisingh denies that he made any statement to Bittelman or otherwise resisted him physically. Instead, Gidarisingh contends that immediately after opening his cell door, Bittelman punched him twice in the face, then slammed him to the concrete floor and began gouging his left eye and choking him. Gidarisingh's account is again consistent with that provided in affidavits submitted by other inmates housed close to his cell in DS-1.

In contrast, Bittelman's account is largely consistent with defendant Millonig's affidavit. Millonig avers that he was working his position as sergeant for the DS-1 building on June 23, 2012. As per normal operating procedures, showers for inmates housed in segregation were started on the first shift. Gidarisingh, housed in cell 13 on the A-upper tier, was handcuffed to be escorted to the A-upper tier shower area. Millonig observed Gidarisingh turning into Bittelman, who turned Gidarisingh back in the direction of travel and ordered him to face forward. Millonig then observed Gidarisingh become "physically restrictive by pulling away" from Bittelman and verbally threatening Bittelman, though Millonig does not recall what was specifically said. (Affidavit of Raymond Millonig ("Millonig Aff.") (dkt. #49) ¶ 10.) In response, Millonig observed Bittelman direct Gidarisingh to the floor. Millonig then ordered defendant Witterholt to assist and activated his unit's assist button.

7

For his part, defendant Witterholt avers that he was directed up to A-upper tier of DS-1 at approximately 1:45 p.m. on June 23, 2012.  As he headed in that direction, he heard Bittelman direct Gidarisingh to stop resisting.  When Witterholt arrived on the tier, both Bittelman and Gidarisingh were on the floor.   Witterholt contends that Bittelman was attempting to gain control of Gidarisingh.  Witterholt states that at that point, he controlled Gidarisingh's legs to prevent him from kicking at staff, by blanketing his legs (presumably with his own body) and wrapping his arms around his legs.  In response, Gidarisingh disputes that he was resisting, stating that Witterholt joined in the attack by punching him in his testicles and causing extreme pain.  In turn, Witterholt expressly disputes Gidarisingh's version of events.

Defendants Franson and Rickey also arrived at the unit and were given a set of leg restraints.  Defendant Rickey maintains that he responded to Millonig's call to DS-1, Cell A-13 on the upper tier, but that the situation was under control by the time he arrived.  Despite the emergency being "called off" or "under control" by that time, Rickey avers that he still "assisted but do[es] not recall to what extent."   (Affidavit of Kelly Rickey ("Rickey Aff.") (dkt. #52) ¶ 8.)  At another point in his affidavit, Rickey avers that he "was not present during the incident on June 23, 2012," and "do[es] not recall having 'hands on' Gidarisingh."  (*Id.* at ¶ 13.)[5]  Gidarisingh, however, contends that Rickey struck him in his right side with his knee and knelt on his back, causing breathing problems, and jammed his fist in his spinal column.  (Pl.'s Resp. to Defs.' PFOFs (dkt. #69) ¶ 92 (citing Gidarisingh Decl. (dkt. #70) ¶¶ 62-63).)  This Rickey denies.

---

[5] Defendants do nothing to clarify this apparent contradiction, repeating both statements in their proposed findings of fact.  (Defs.' PFOFs (dkt. #56) ¶¶ 92, 97.)

Finally, Franson contends that upon his arrival, he "bladed" Gidarisingh's shoulder and upper chest, which means that he laid his shin across his upper body to control him until the leg restraints could be placed by Witterholt.  Gidarisingh does not dispute this account.  Franson also avers that he ordered Gidarisingh to keep his spit in his mouth because it appeared Gidarisingh had a mouth full of saliva and that Gidarisingh then swallowed.  Gidarisingh disputes both that Franson ordered him to not spit and that he had excess saliva in his mouth.

Franson avers that he ordered Gidarisingh to stand, but that Gidarisingh refused. In contrast, Gidarisingh claims he was unconscious after the attack and had difficulty walking, which required defendants to assist him to the shower stall.  Franson disputes this account, stating that Gidarisingh was speaking to Franson during the entire process. Franson represents that Gidarisingh simply refused to walk, stopping several times, and also pulling his knees to his chest, requiring staff to bare his weight.[6]

### iv.    Strip Search

At the shower, Franson states that he then ordered a staff-assisted strip search because "he did not feel comfortable having staff relinquish physical control of him." (Affidavit of Brian T. Franson ("Franson Aff.") (dkt. #45) ¶ 18.)  There is no dispute that Gidarisingh was subject to a strip search in the shower area, while tethered to the inside of the shower door.  Gidarisingh avers that defendant Rickey pulled and cut off his

---

[6] Defendants Bittelman, Witterholt, Millonig, and Rickey completed incident reports, detailing the incident on June 23, 2012, the contents of which are largely consistent with their descriptions above.  (Ex. 1007 (dkt. #40-3) pp.1-13.)

clothing in the open shower observation area, lifted his penis and testicles and spread his buttocks, in front of other inmates and staff.

Rickey avers that while he remembers being "around the area" when Gidarisingh was led to the shower area for a strip search, he would not have performed the actual cutting off of his clothes or the physical search since the standard operating procedure is for the regular staff assigned to the unit to perform the search. Franson further maintains that it would not have been possible for other inmates to view Gidarisingh because of the bubble wall and the staff congestion in the area.

After the strip search was conducted, HSU was contacted to evaluate a small abrasion on Gidarisingh's left cheek area. Nurse Campbell avers that his left eye was slightly reddened, but there was no "active" bleeding. Gidarisingh maintains that he was bleeding from his left eye, with blood running down his face. Gidarisingh further avers that he told her about his neck, back, chest and heart area pain, but Campbell neither assessed these concerns nor otherwise provided medical treatment.

Franson avers that Gidarisingh was naked only for the amount of time it took Campbell to arrive and assess him, which Franson further represents was just a "few moments" and not thirty minutes. (Defs.' PFOFs (dkt. #56) ¶ 143 (citing Franson Aff. (dkt. #45) ¶ 17).) Franson also believes they wrapped a towel around Gidarisingh's waist, but Gidarisingh insists that he was left completely naked. Gidarisingh maintains that he was in the observation shower area, naked and chained to the door in handcuffs and leg restraints for thirty minutes.

10

###### v.    Investigation

On or about June 25, 2012, Gidarisingh wrote a letter to Warden Michael Meisner and a second letter to defendant Nickel, in which he recounted his version of the events of June 23 and 24.  (Pl.'s Exhibits, Exs. 14-15 (dkt. #71-2) pp.40-49.)  Casiana was assigned to investigate the allegations in Gidarisingh's letters, ultimately determining that it was more likely than not that Gidarisingh (1) was offered medical services, (2) threatened staff, refused orders and resisted staff, (3) was not punched by staff nor did staff gouge his eyes, and (4) exaggerated the altercation and the extent of his injuries.  In response to Casiana's report, Nickel concluded that all officers involved were advised that incident reports were necessary in the event of witnessing/participating in the use of force, and recommended that Gidarisingh be issued a conduct report for alleged lying about staff.  Meisner reviewed the report and closed the investigation.

### D. Requests for Medical Care during Controlled Separation

After the strip search, Gidarisingh was placed in cell 45 on "controlled separation" status under Wis. Admin. Code § DOC 303.71.  A security supervisor may order an inmate in segregation to controlled separation status for disruptive or destructive behavior.  Gidarisingh was released from controlled separation status the next day on June 24, 2012.

In cell 45, Gidarisingh was given an anti-suicide smock and security mattress.  The smock is heavy, quilt-like and has insulation qualities.   Franson recalls that the

temperature was in the low 80s that day.  He does not recall Gidarisingh asking for any additional property.  Gidarisingh, however, maintains that he asked for a blanket.[7]

While housed in cell 45, Gidarisingh was checked by a staff member every thirty minutes.  At least initially, defendant Casiana checked on Gidarisingh.  During one of those checks, around 2:38 p.m., Gidarisingh asked defendant Casiana to see a nurse due to what he now characterizes as extreme pain in his left eye, back, neck, chest and heart area.  Casiana does not dispute that Gidarisingh requested to see a nurse, and a log containing observations of Gidarisingh and a record of staff visitors, also contains a note by Casiana indicating that Gidarisingh requested to see a nurse at 2:38 p.m. on the 23rd. (Affidavit of Kevin Boodry ("Boodry Aff."), Ex. 1006 (dkt. #41-1) p.3.)

On the other hand, Casiana submitted an affidavit in support of defendants' motion for summary judgment.  In one paragraph, Casiana states that he "do[es] not recall why [Gidarisingh] wanted to see a nurse or [if he] made a specific indication about a chief complaint."  (Affidavit of Timothy Casiana ("Casiana Aff.") (dkt. #43) ¶ 7.)  Yet in the next paragraph, Casiana also avers that "Gidarisingh did not complain about heart or chest pains or request medical care for the injuries he allegedly received during the June 23, 2012 incident."  (*Id.* at ¶ 8.)  In yet another arguable inconsistency, Casiana nonetheless recalls contacting HSU to confirm that Gidarisingh had been seen earlier that day following the physical incident.

---

[7] Gidarisingh was denied leave to proceed on a conditions of confinement claim based on an alleged denial of a blanket for an approximately 24-hour period, but the alleged denial could at least technically be considered as a retaliatory act in support of his First Amendment retaliation claim.

Gidarisingh represents that between approximately 2:30 p.m. on June 23 until approximately 4:00 p.m. on June 24, 2012, when he was released from controlled separation, he complained to defendants Casiana, Franson, Boodry, Julson, Millonig, Witterholt and Hooper, requesting medical attention.   Relying on the log described above, defendants dispute this.   In the log itself, defendants recorded observations on Gidarisingh's behavior, e.g., whether he was sitting on the bed, pacing, standing, etc. (Boodry Aff., Ex. 1006 (dkt. #41-1).)   Since there is no obvious place in the log form to record a request for medical treatment, the import of this document is unclear.   In contrast, the same form contains specific places where officers could record whether and when Gidarisingh was offered water, medication, and a meal.

Millonig avers that he does not recall whether or not Gidarisingh made a medical complaint between June 23rd and 25th.   Julson also does not recall Gidarisingh requesting medical care or otherwise complaining of heart or chest pains on June 23rd or 24th.  Boodry and Hooper similarly aver that Gidarisingh did not bring to their attention any medical concerns and did not request any additional property (e.g., a blanket).

### E.  Subsequent Requests for Medical Care

After leaving cell 45, Gidarisingh submitted an HSR on June 25, 2012, complaining of pain in his left eye, back and neck.   The June 26th response to that indicated that Gidarisingh would be scheduled to see a RN.  Defendants maintain that Gidarisingh was scheduled to see a nurse on June 27th, but that defendant Valerius's

13

note in Gidarisingh's chart indicates that he again refused that appointment.  Gidarisingh disputes that he did so.

On June 30, 2012, Gidarisingh voiced a complaint of eye pain during health rounds; his complaint was forwarded to optometry.  On July 3, Gidarisingh submitted a HSR complaining of severe heart and chest pain and inquiring as to the status of the test Dr. Suliene had ordered.  A response to this HSR was provided on July 4, indicating that he had been scheduled for an x-ray on July 3, but that appointment was cancelled after he refused his sick call appointment on June 27.  The response also indicated that he was rescheduled for a sick call appointment.  On July 3, Gidarisingh submitted another HSR complaining of left eye pain.  The responses similarly provided that he was would be rescheduled.

On June 25, July 5 and July 6, 2012, Gidarisingh sent letters to HSU complaining of Campbell's denial of medical treatment on the 23rd and further indicating that his requests for care since then have been ignored.  On July 6 and 7, Gidarisingh submitted requests seeking copies of Suliene's June 21st order, among other requests.

On July 9, 2012, Gidarisingh was seen by a nurse at HSU for complaints of chest pain and left eye pain.[8]  The nurse's notes indicate that there was no redness, drainage or discoloration in his left eye.  The notes further indicate that she checked with the doctor about the prescribed EGD, and subsequently arranged for the test to take place in

---

[8] Defendants do not indicate which nurse provided treatment, and the court cannot discern the name of the nurse from the signature at the bottom of the Nursing Encounter Protocols form.  (Ex. 1004 (dkt. #51-1) p.5.)

September.  The nurse further provided Gidarisingh with a bottle of artificial tears and instructed him to place a cool or warm compress on his eye for comfort.

On July 19, 2012, Gidarisingh submitted a request to see the eye doctor due to pain in his left eye.  HSU responded the next day indicating that he was on the waiting list. On July 30, Gidarisingh again submitted a request to see the eye doctor, and was told that he would be seen "soon."  On August 12, Gidarisingh again submitted a HSR complaining that he was experiencing excruciating pain in his left eye.  Gidarisingh was told that he would be seen "this week."  Gidarisingh was seen by an optometrist for eye pain on August 15, but Gidarisingh contends that the eye doctor did not address his eye pain, but rather prescribed a new pair of prescription glasses.

On July 23, 2012, during health rounds, Gidarisingh complained of left side numbness.   A chest x-ray and EKG were subsequently ordered.   On August 12, Gidarisingh submitted an HSR, asking when he was scheduled for tests.   Valerius responded that he would be seen in HSU for additional tests next week and that he was scheduled to be seen by a UW specialist in September.  On August 26, Gidarisingh again submitted a HSR, complaining of chest pain and pain in his left eye.  A response provided the next day indicated that he was scheduled for some tests related to his chest pain.  Gidarisingh was seen UW Health on September 12 for an EGD test with biopsy. The results of that test indicate that there was no hiatal hernia or evidence of esophagitis, but that there was "increased vascularity of esophageal mucosa at GE junction, [which] can be associated with reflux."   (Affidavit of Brian Neumaier ("Neumaier Aff."), Ex. 1004, part 2 (dkt. #51-1) p.25.)  The biopsy was normal.  (*Id.* at p.23.)

15

### F.  Conduct Reports

Bittelman issued Gidarisingh Conduct Report No. 2159939 for his misconduct during the June 23rd incident.   Nickel approved it for further processing.   The disciplinary hearing on the report was held on July 13, 2012, with a committee consisting of defendants Morgan and Ziegler.   (Defendant Hautamaki did not participate.) Gidarisingh attended the hearing and provided a written statement in advance.   The parties dispute whether Gidarisingh was argumentative and difficult during the hearing. Prior to the hearing, Gidarisingh had posed a series of written questions for Bittelman to answer, which he did.

The same day as the hearing, the committee found Bittelman's account to be credible, found Gidarisingh not credible, and rejected his objections to the hearing.   The committee further found Gidarisingh guilty of battery, disobeying orders, and threat charges, and sentenced him to 10 days loss of recreation and 300 days disciplinary separation.   Gidarisingh appealed the disciplinary committee's decision to the CCI warden.   The warden's designee, defendant Douma, reviewed the appeal and affirmed the decision and sentence.

After completion of the investigation described above, Casiana also issued Gidarisingh Conduct Report No. 2250976 for lying about staff conduct during the June 23rd incident on September 5, 2012.  Franson reviewed the conduct report and approved it for further processing.  The disciplinary hearing was held on October 1, 2012, in front of a disciplinary committee consisting of Morgan and Hautamaki.  (Ziegler did not

16

participate in this hearing.)  Gidarisingh attended the hearing and made a statement in which he challenged being punished for the same incident twice, among other points.

The committee found Gidarisingh not credible and the other witnesses credible. The committee further found Gidarisingh guilty of lying about staff.  As a result, Gidarisingh received a disposition of 210 days disciplinary separation.  Gidarisingh appealed the committee's decision to the CCI Warden.  Douma, acting as the warden's designee, affirmed the committee's decision and sentence.

### G. Supervising Officers Knowledge of Bittelman's Propensity for Violence and Campbell's Failure to Provide Medical Care

In response to Gidarisingh's failure to protect claim, defendants Nickel, Ashworth, and Morgan uniformly aver that they are unaware of any incidents where Bittelman was disciplined for being "violent with inmates."  (Affidavit of Janel Nickel ("Nickel Aff.") (dkt. #78) ¶ 48; Affidavit of Anthony Ashworth ("Ashworth Aff.") (dkt. #40) ¶ 9; Affidavit of Donald Morgan ("Morgan Aff.") (dkt. #50) ¶ 33.)  Morgan further avers that Bittelman does not have a "propensity for violence."  (Morgan Aff. (dkt. #50) ¶ 32.)

Gidarisingh disputes this, contending that Bittelman has assaulted several other inmates in DS-1 and that Morgan is aware of these assaults.  More specifically, Gidarisingh directs the court to a declaration by inmate Darrin A. Gruenberg, averring that Bittelman physically assaulted him on February 13, 2012, and that he filed an institution complaint against Bittelman.  (Pl.'s Exhibits, Ex. 29 (dkt. #71-3) p.40.)

17

Gidarisingh, however, concedes that he did not submit a complaint about Bittelman being violent before the incident on June 23, 2012.[9]

All three defendants similarly aver to being unaware of Campbell having a history of ignoring inmate requests for medical care.  (Nickel Aff. (dkt. #78) ¶ 49; Ashworth Aff. (dkt. #40) ¶ 10; Morgan Aff. (dkt. #50) ¶ 34.)


OPINION

Gidarisingh was granted leave to proceed on the following claims, against the following defendants:

| Claim | Defendants |
|---|---|
| Deliberate indifference to serious medical needs under the Eighth Amendment | Bittelman, Witterholt, Millonig, Campbell, Casiana, Franson, Boodry, Julson, Hooper, and Valerius |
| Negligence with respect to denial of medical treatment | Bittelman, Witterholt, Millonig, Campbell, Casiana, Franson, Boodry, Julson, Hooper, and Valerius |
| Excessive force in violation of the Eighth Amendment | Bittelman, Witterholt, and Rickey |
| Battery with respect to June 23rd incident | Bittelman, Witterholt, and Rickey |
| Failure to protect in violation of the Eighth Amendment | Franson, Ashworth, Nickel and Morgan |
| Conditions of confinement based on being held naked in violation of the Eighth Amendment | Rickey and Franson |
| First Amendment retaliation | Bittelman, Witterholt, Valerius, Campbell, Neumaier, Morgan, Ziegler, Douma, Casiana, Franson, and Hautamaki |

---

[9] While Gidarisingh submitted a request for formal separation from Bittelman, his request was also submitted after the June 23rd incident.  (Affidavit of Anthony Ashworth ("Ashworth Aff."), Ex. 1007 (dkt. #40-3) p.22.)

18

The court addresses defendants' motion for summary judgment with respect to each of these claims separately below.

## I.   Medical Treatment Claims

Plaintiff was granted leave to proceed on Eighth Amendment deliberate indifference and negligence claims premised on defendants' alleged failure to provide adequate medical care.  Consistent with the court's treatment of Gidarisingh's claims in its screening order, these claims cover three time periods and are directed at various defendants: (1) June 23rd requests for medical attention due to chest and heart pain, which preceded the physical incident involving Bittelman, Witterholt and Millonig; (2) June 23rd and 24th requests for treatment of an injured eye and for neck and back pain involving defendants Campbell, Casiana, Franson, Boodry, Julson, and Hooper; and (3) subsequent requests for medical treatment of eye, neck and back, and chest and heart pain involving defendants Campbell and Valerius.

### A.  Deliberate Indifference Claim

For plaintiff to survive summary judgment on his claim that defendants were deliberately indifferent to his serious medical needs, he is required to provide evidence from which a reasonable jury could find that (1) Gidarisingh had an objectively serious medical need and (2) defendants were deliberately indifferent to it.  *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008).

As for Gidarisingh's complaints of chest and heart pain, defendants submit the expert testimony of Dr. Suliene, who opines that GERD "is a chronic condition, but not a serious medical need." (Declaration of Dalia Suliene, M.D. ("Suliene Decl.") (dkt. #57) ¶ 34.) Since Dr. Suliene does not define "serious medical need," her definition may not be synonymous with the law. For example, a serious medical need under the law includes instances of withholding of medical care that results in needless pain and suffering. *See Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997). Of course, it is Gidarisingh's burden to establish a serious medical need. This he has not done either (1) by establishing his GERD or eye condition ever led to complications or need for serious treatment; or (2) describing severe pain that only subsided with treatment.[10]

Even if Gidarisingh could meet the "serious medical need" threshold, he still falls short of proof with respect to whether defendants were deliberately indifferent to his serious medical needs. In *Gayton v. McCoy*, 593 F.3d 610 (7th Cir. 2010), the Seventh Circuit described the proof required to establish "deliberate indifference":

> [T]he plaintiff must show that the official acted with requisite culpable state of mind. This inquiry has two components. The official must have subjective knowledge of the risk to the inmate's health, and the official also must disregard that risk. Evidence that the official acted negligently is insufficient to prove deliberate indifference. Rather, deliberate indifference is simply a synonym for intentional or reckless conduct, and

---

[10] In faulting Gidarisingh for this lack of proof, the court has in mind its decision to deny Gidarisingh's requests for assistance in recruiting pro bono counsel, which in turn could arguably have assisted in retaining an expert to support claims that Gidarisingh's medical needs -- particularly with respect to the degree of pain from and available treatment for GERD, his eye, back and neck -- were serious medical conditions. Still, this impediment does not excuse Gidarisingh's total failure to establish even now that his was a serious medical condition for which treatment was ultimately necessary to correct the condition or at least alleviate serious pain.

> that 'reckless' describes conduct so dangerous that the deliberate nature of the defendant's actions can be inferred. Simply put, an official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Even if a defendant recognizes the substantial risk, he is free from liability if he responded reasonably to the risk, even if the harm ultimately was not averted.

*Id.* at 620 (internal quotations and citations omitted).  Gidarisingh has not met this burden for the period immediately before or after the June 23rd incident or any time subsequent.

### 1. June 23rd Complaints of Chest and Heart Pain

On the morning of June 23, 2012, defendants concede that Gidarisingh complained of heart and chest pains to Bittelman.  Gidarisingh has also raised a genuine issue of fact as to whether he alerted Millonig and Witterholt about these same concerns. However, Bittelman also represents -- and Gidarisingh failed to dispute -- that he contacted HSU about these complaints and was told that Gidarisingh should submit an HSR.  In light of this inquiry, Gidarisingh's recent complaints of GERD, and the fact that Gidarisingh had just seen Dr. Suliene two days before about these very complaints, no reasonable jury could find that Bittelman, Millonig and Witterholt acted recklessly with regard to Gidarisingh's complaints of chest and heart pain.

This finding is bolstered by the well-established principle that "[e]xcept in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals." *Johnson v. Doughty*, 433 F.3d 1001, 1011 (7th Cir.

2006) (internal citation and quotation marks omitted); *see also Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (holding that nonmedical prison employees are "entitled to defer to the judgment of jail health professionals, so long as [they] did not ignore [plaintiff]"); *Greeno v. Daley,* 414 F.3d 645, 657 (7th Cir. 2005) (finding no deliberate indifference on the part of non-medical defendants who relied on HSU's assurance that inmate's health concerns were being addressed).

### 2. Post-Attack Treatment

Gidarisingh next complains of medical care immediately after the attack and while held in controlled separation status on June 23 and 24, 2012.  Immediately following the attack, it is undisputed that Nurse Campbell *was* called to the shower area to examine Gidarisingh.  While plaintiff complains about the lack of any treatment, there is again no dispute that Campbell examined Gidarisingh and found no injuries which warranted treatment.  Gidarisingh may have disagreed with her assessment, but no reasonably jury could find Campbell, or the defendants who called for her, acted with reckless disregard of Gidarisingh's medical needs, especially since there is *no* evidence that Gidarisingh ever required follow up treatment or suffered any long-term injuries.    Again, mere disagreement with a medical profession's judgment is insufficient to constitute deliberate indifference.  *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007); *Greeno*, 414 F.3d 645, 653 (7th Cir. 2005) (noting that "a mere disagreement with a doctor's medical judgment" does not amount to deliberate indifference).

22

While on controlled status, Gidarisingh also represents that he asked a number of other defendants for medical treatment. Other than Casiana, none of the defendants recall such requests. Even crediting Gidarisingh's account at this stage, as the court must, no reasonable jury could find that defendants acted in reckless disregard of Gidarisingh's medical needs by failing to forward his requests to HSU or otherwise insure treatment for the approximate 26-hour period while Gidarisingh was on controlled separation status because: (1) he had been seen by Dr. Suliene for treatment two days prior to the June 23rd incident; and (2) any injuries due to the physical incident had been assessed immediately after the incident by Nurse Campbell. *See Johnson*, 433 F.3d at 101; *Berry*, 604 F.3d at 440; *Greeno,* 414 F.3d at 657.

### 3. Subsequent Requests for Medical Treatment

Finally, Gidarisingh complains about a lack of medical treatment in the weeks following the June 23rd incident. This claim is directed solely against the two nurse defendants, Campbell and Valerius. As an initial matter, individual liability under § 1983 requires "personal involvement." *See Smith v. Bray*, 681 F.3d 888, 899 (7th Cir. 2012) ("[I]ndividual liability under § 1983 is appropriate where the 'individual defendant caused or participated in a constitutional deprivation.'") (quoting *Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003)). As such, Campbell and Valerius cannot be liable based merely on actions or omissions of Dr. Suliene or other HSU staff.

23

From the record, it appears that Valerius was involved in two medical incidents. First, on June 27, 2012, Valerius made the notation that Gidarisingh refused a sick call appointment. She acknowledges making this notation, but understandably enough no longer recalls the reason for her note. Second, on August 12, Gidarisingh submitted an HSR, asking when he was scheduled for tests, and Valerius responded that he would be seen in HSU for additional tests next week and was scheduled to be seen by a UW specialist in September. From this limited record, no reasonable jury could find that Valerius acted in reckless disregard of Gidarisingh's medical needs. As for defendant Campbell, there is *no* mention of her involvement in Gidarisingh's medical treatment after her assessment of his injuries on June 23rd. As such, there is also no basis for finding her deliberately indifferent to Gidarisingh's medical needs, serious or otherwise.[11]

If the court were to disregard the personal involvement requirement, the record further reflects that Gidarisingh *was* seen by HSU on July 11th, approximately two weeks after the physical incident. Moreover, Gidarisingh's eye complaint was forwarded to the optometrist, and he was seen by that specialist in mid-August. Gidarisingh also saw a UW specialist to evaluate whether he had any conditions requiring surgery or other treatment as a result of his GERD. While a delay in treatment can constitute deliberate indifference in certain circumstances, any delay at issue here does not rise to that level, because Gidarisingh fails to put forth evidence that the delay exacerbated any injury or prolonged his pain. *See Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *McGowan v. Hulick*,

---

[11] To the extent Valerius or Campbell were involved in Gidarisingh's care on other occasions, he has failed to direct the court to those instances in his summary judgment opposition.

612 F.3d 636, 640 (7th Cir. 2010) ("[T]he length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment.") (citations omitted). Indeed, there is no evidence that either visit resulted in meaningful, much less serious, medical attention.

### B. Negligence Claim

In light of this court's decision granting defendants' motion for summary judgment on plaintiffs' Eighth Amendment deliberate indifference claim, the court will decline to exercise supplemental jurisdiction over Gidarisingh's state law negligence claim, finding that the facts and law surrounding that claim are distinct from the facts at issue in any of the other federal law claims that might proceed to trial. *See* 28 U.S.C. § 1367(c)(4) (distinct nature of facts and law of state claim constitutes a compelling reason for declining to exercise supplemental jurisdiction). Accordingly, the court will dismiss plaintiff's negligence claim without prejudice.

## II. June 23rd Physical Altercation

Plaintiff asserts two claims based on the June 23rd physical altercation itself: an Eighth Amendment excessive force claim and a state law battery claim, both of which are asserted against Bittelman, Witterholt, and Rickey.

### A. Eighth Amendment Claim

The Eighth Amendment prohibits conditions of confinement that "involve the wanton and unnecessary infliction of pain." *Rhodes v. Chapman*, 452 U.S. 337, 347

(1981).  Because prison officials must sometimes use force to maintain order, the central inquiry for a court faced with an excessive force claim is whether the force "was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992).  To determine whether force was used appropriately, a court considers the safety threat perceived by the officers, the need for the application of force, the relationship between that need and the amount of force used, the extent of the injury inflicted and the efforts made by the officers to mitigate the severity of the force.  *Whitley v. Albers*, 475 U.S. 312, 321 (1986); *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001).

### 1.  Defendant Bittelman

Plaintiff focuses his excessive force claim on Bittelman's actions.  As evidenced by the record described above, plaintiff's claim against Bittelman turns on credibility determinations.  According to Gidarisingh, and corroborated at least in part by other inmates, Bittelman punched him and gouged out his left eye in a premeditated, orchestrated and unprovoked attack.  According to Bittelman on the other hand, Gidarisingh became physically resistant during a routine trip to the shower, and he feared that Gidarisingh would lash out at him.  Although the ultimate injury to Gidarisingh does not appear substantial, a reasonable jury *could* find that Bittelman engaged in an unprovoked physical attack in a malicious effort to cause harm.  *Hudson*, 503 U.S. at 6-7.

In a somewhat convoluted argument, defendant Bittelman also asserts a qualified immunity defense essentially because:  (1) the court may grant qualified immunity even if disputed issues of fact exist; and (2) a defendant's subjective intent is "simply

26

irrelevant" to such a determination.  (Defs.' Opening Br. (dkt. #38) 34.)  On the first

point, as articulated in the very case cited by defendants,

> when a claim of qualified immunity arises as part of a
> summary judgment motion, the district court should, as in
> any summary judgment case, look at all of the undisputed
> evidence in the record, construed in a light most favorable to
> the non-movant.  If the undisputed facts, so read, show that
> the defendant's conduct, as a matter of law, violated no
> clearly established legal norms, then the district court must
> grant the defendant qualified immunity. However, if there are
> issues of disputed fact upon which the question of immunity
> turns, or if it is clear that the defendant's conduct did violate
> clearly established norms, the case must proceed to trial.

*Green v. Carlson*, 826 F.2d 647, 652 (7th Cir. 1987).

For the reasons articulated above, Bittelman's assertion of immunity necessarily

turns on issues of disputed fact.[12]  The jury will need to determine whether his use of

force was a good faith effort to maintain order or inflict punishment.  If they find that it

was the latter, then a qualified immunity defense would fail because it is clearly

established that an officer may not use force "maliciously and sadistically to cause harm."

*Hudson*, 503 U.S. at 6-7; *see also Hill v. Shelander*, 992 F.2d 714, 718 (7th Cir. 1993)

("The notion that unnecessary and wanton infliction of pain constitutes cruel and

---

[12] Of course, there may be instances, as defendants assert and as described by the *Green*
Court in a footnote, where the existence of factual dispute may preclude a grant of
summary judgment on the merits, but not preclude a qualified immunity defense.  826
F.2d at 652 n.4.  For example, there are certainly cases where you can accept the facts as
set forth by the plaintiff, and still find that the defendant's actions did not violate clearly
established constitutional rights.  *See Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006)
(finding defendants were entitled to qualified immunity on Eighth Amendment claim
based on plaintiff's version of the facts).

unusual punishment forbidden by the Eighth Amendment is not a new or unusual constitutional principle." (internal quotations and citations omitted)).

As for defendants' second point, the court agrees that qualified immunity turns on what a reasonable person would know, not on what an individual defendant subjectively knows.  For this reason, a plaintiff need not show that the individual defendant actually knew that his conduct violated clearly established, statutory or constitutional rights. Similarly, even if a plaintiff claims that the individual defendant intended to violate the plaintiff's constitutional rights, no qualified immunity defense would lie unless the defendant's conduct violated a plaintiff's clearly established rights.  *See Crawford-El v. Britton*, 523 U.S. 574, 587-88 (1998) (discussing holding in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)).  Here, plaintiff's constitutional claim turns on which version of the facts the jury believes:  if plaintiff's, then Bittelman's action in taking plaintiff to the ground, while punching and gouging his eye, was unprovoked and objectively contrary to the Eighth Amendment; if defendants, Bittelman's action in taking plaintiff to the ground to control his acting out was objectively reasonable.  *See Mitchell v. Krueger*, No. 14-1816, 2014 WL 5840734 at *2-3 (7th Cir. Nov. 12, 2014) (genuine issues of material fact existed as to whether guard's use of force after prisoner was restrained was excessive).  As explained above, the court cannot assess Bittelman's entitlement to qualified immunity absent resolution of this key factual dispute.

## 2.  Defendants Witterholt and Rickey

Gidarisingh also asserts claims against Rickey and Witterholt based on their role in the June 23rd physical incident.  The record on summary judgment establishes that

Witterholt was ordered to the top tier by Millonig to assist Bittelman in restraining Gidarisingh. Rickey similarly responded to Millonig's call, seeking assistance. Whatever happened before Bittelman and Gidarisingh ended up on the floor occurred before these two defendants arrived on the scene. As such, they were necessarily relying on their fellow officer's assessment of the situation and apparent need to "decentralize" Gidarisingh. Even if Bittelman were acting in bad faith at that point, Witterholt and Rickey had no way of immediately knowing that. *Cf. Bruce v. Guernsey*, No. 14-1352, 2015 WL 309497, at *4 (7th Cir. 2015) (discussing "collective knowledge doctrine, under which a law enforcement officer may rely on information conveyed to him by another law enforcement officer or the agency for which he works" in the Fourth Amendment context). Based on this, the court finds that Witterholt and Rickey's joining what they perceived to be Bittelman's efforts to restrain Gidarisingh cannot form the basis of an Eighth Amendment excessive force claim.

That said, defendants' actions *after* they joined Bittelman in restraining Gidarisingh could form a basis of such a claim if their subsequent use of force was intended to maliciously cause harm. Gidarisingh contends that Rickey struck him in his right side with his knee, knelt on his back causing breathing problems and jammed his fist in his spinal column, all of which Rickey denies. (Pl.'s Resp. to Defs.' PFOFs (dkt. #69) ¶ 92 (citing Gidarisingh Decl. (dkt. #70) ¶¶ 62-63).) Unlike Gidarisingh's allegations asserted against Bittelman -- that he punched him twice unprovoked -- these alleged actions are arguably consistent with Rickey's claim that he was restraining Gidarisingh, and might prevent a finding that Rickey acted maliciously. *See, e.g., Fillmore*,

29

358 F.3d at 504 (holding that to survive summary judgment on an Eighth Amendment excessive force claim, a prisoner must have evidence that supports a "reliable inference of wantonness in the infliction of pain" (quoting *Whitley v. Albers*, 475 U.S. 312, 322 (1986))); *Smith v. Dart*, No. 10 C 6395, 2013 WL 315742, at *10 (N.D. Ill. Jan. 28, 2013) (granting summary judgment to defendant prison correctional officers where "no reasonable jury could find that the force used by [defendants] was excessive, and that their actions represented a good faith effort to restore order and prevent Plaintiff from doing himself any further harm"). Still, this account too depends on the nature of the scene upon which Rickey and Witterholt arrived. If as Gidarisingh avers, he was already on the ground, handcuffed with his arms behind him and not resisting, this same conduct may be found to be objectively unreasonable. *Mitchell*, 2014 WL 5870724, at *2-3.

In contrast, Witterholt represents that he merely controlled Gidarisingh's legs to prevent him from kicking at staff by blanketing his legs (presumably with his own body) and wrapping his arms around his legs. Neither action would give rise to an objective excessive force claim, but Gidarisingh also maintains that Witterholt joined in the attack by punching him in his testicles. This characterization of Witterholt's actions moves him much closer to that of Rickey's conduct, leaving a reasonable jury to sort out the facts. *Id*.

Accordingly, the court will grant defendants' motion for summary judgment on the Eighth Amendment excessive force claim as to defendants Bittelman, Rickey and Witterholt.

### B.  State Battery Claim

In addition to the Eighth Amendment claim, plaintiff also asserts a state law battery claim based on the same June 23rd incident.  Under Wisconsin law, "to establish that a battery has occurred a plaintiff must establish the following three elements: (1) an unlawful use of force or violence upon another; (2) the intentional direction of such force or violence at the person of another; and (3) bodily harm sustained on the part of the person against whom such force or violence is directed."  *Vandervelden v. Victoria*, 177 Wis. 2d 243, 249, 502 N.W.2d 276, 278 (Ct. App. 1993) (citing Wis J I-Civil 2005). In moving for summary judgment on this claim, defendants simply contend that the Bittelman, Rickey and Witterholt "acted appropriately to control the plaintiff; excessive force was not used."  (Defs.' Opening Br. (dkt. #38) 35.)  Because the court finds that plaintiff has raised a genuine issue of fact as to whether these defendants' use of force was objectively reasonable, the court will similarly allow plaintiff to proceed on a state law battery claim against them.


### III.    Failure to Protect

In a case alleging an official's failure to protect a prisoner from harm, "[t]he inmate must prove a sufficiently serious deprivation, *i.e.*, conditions which objectively 'pos[e] a substantial risk of serious harm.'"  *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996).  In addition, the inmate must prove that the prison official acted with deliberate indifference to the inmate's safety, "effectively condon[ing] the attack by allowing it to

happen." *Langston v. Peters*, 100 F.3d 1235, 1237 (7th Cir. 1996) (quoting *Haley v. Gross*, 86 F. 3d 630, 640 (7th Cir. 1996)).

### A.  Defendant Franson

Gidarisingh's failure to protect claim asserted against Franson is based on Franson's watching of the alleged attack.  The record reflects that Franson responded to Millonig's unit alarm, bringing Rickey and leg restraints with him.  When he arrived, Bittelman and Witterholt were already on the floor with Gidarisingh.  For the reasons articulated above, Franson necessarily relied on Bittelman's decision to decentralize Gidarisingh based on events which Franson did not witness.  As for Franson's supervision of Bittelman, Rickey and Witterholt's collective restraint of Gidarisingh, a reasonable jury *could* conclude that Franson condoned an attack if Gidarisingh's version of events were credited.

### B.  Defendants Ashworth, Nickel and Morgan

Gidarisingh also asserts a failure to protect claim against Ashworth, Nickel and Morgan based on their knowledge of Bittelman's alleged propensity for violence and Campbell's alleged indifference to medical needs.  Taking the latter claim first, it is undisputed that all three defendants were unaware of Campbell's alleged indifference to the medical needs of inmates.  At a minimum, plaintiff must show actual knowledge of

the risk for his claim to move forward.  *See McGill v. Duckworth*, 944 F.2d 344, 349 (7th Cir. 1991).[13]

As for plaintiff's claim that these three defendants failed to protect him from Bittelman, plaintiff has failed to offer any evidence that these three defendants had *personal* knowledge of Bittelman's alleged unlawful use of force in February 2012, the lone identified prior incident.  Even if these defendants were aware of that incident, plaintiff has also failed to demonstrate that this one alleged incident could support a jury's finding of actual knowledge of "impending harm" caused by Bittelman.  *Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997).

## IV.     Conditions of Confinement

Plaintiff was also granted leave to proceed on a claim against defendants Rickey and Franson for holding him naked outside of the shower facility in violation of his Eighth Amendment rights.   After the assault, Gidarisingh specifically claims (1) defendant Rickey pulled off his clothes and left him naked, handcuffed and shackled, outside of the shower area in sight of other guards, inmates, and Nurse Campbell for approximately thirty minutes; and (2) Rickey and Franson then escorted him naked past other guards and inmates to the controlled segregation cell.

To state a conditions of confinement claim under the Eighth Amendment, a plaintiff must satisfy a test that involves both a subjective and objective component.

---

[13] More recently, the Seventh Circuit has explained that plaintiff would have to show that "the supervisor must want the forbidden outcome to occur."  *Vance v. Rumsfeld*, 701 F.3d 193, 204 (7th Cir. 2011) (*en banc*) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).

*Farmer*, 511 U.S. at 834.  The objective analysis focuses on whether prison conditions were sufficiently serious that "a prison official's act or omission results in the denial of the minimal civilized measure of life's necessities," *Farmer*, 511 U.S. at 834, or "exceeded contemporary bounds of decency of a mature, civilized society," *Lunsford v. Bennett*, 17 F.3d 1574, 1579 (7th Cir. 1994).  The subjective component requires proof that prison officials acted wantonly and with deliberate indifference.  *Id.*

As the court explained in the screening order, Gidarisingh has no claim against Rickey and Franson purely based on their and other staff observing him nude.  *See Johnson v. Phelan*, 69 F.3d 144, 146 (7th Cir. 1995).  On the other hand, deliberately removing an inmate's clothing and leaving him exposed for an extended period of time in view of other inmates for the purpose of shaming or humiliating him could form the basis of a conditions of confinement claim.  *See Mays v. Springborn*, 575 F.3d 643, 649-50 (7th Cir. 2009) (explaining that strip searches can form the basis of a constitutional challenge if "conducted in a harassing manner intended to humiliate and cause psychological pain").

The parties dispute:  (1) whether Gidarisingh was totally naked or whether he had a towel wrapped around his waist; (2) even if he was totally naked, whether it was his choice to be so, having rejected the towel; (3) the length of time he was held naked; and (4) whether other inmates and staff could see him naked.  Accepting Gidarisingh's version of the facts, the court concludes that a reasonable jury could find that Rickey and Franson conducted the strip search and held Gidarisingh naked in view of others for the purpose of humiliating him.  *See Mays*, 575 F.3d at 649-50 (reversing district court's

grant of summary judgment of conditions of confinement claim, finding that sufficient basis for reasonable jury to conclude that public strip searches constituted a violation of the Eighth Amendment).   Accordingly, the court will deny defendants' motion for summary judgment on this claim as well.

## V.   First Amendment Retaliation

Finally, Gidarisingh asserts a First Amendment retaliation claim against a number of defendants for retaliating against him after threatening to file a complaint about their denial of medical treatment on June 23rd, as well as after his subsequent written complaints about the continued denial of medical care and the June 23rd attack. Specifically, Gidarisingh claims that (1) defendants Bittelman, Witterholt and Rickey attacked him on June 23rd because of his oral threat to file a complaint; (2) defendants Valerius, Campbell, Neumaier, and Bittelman denied him medical treatment for similar reasons; and (3) defendants Bittelman, Morgan, Ziegler, Douma, Casiana, Franson, and Hautamaki issued and adjudicated conduct reports, all in retaliation for his complaining about this denial of medical care and the June 23rd physical incident.

To prevail on a claim for retaliation under the First Amendment, Gidarisingh must demonstrate that:  (1) he engaged in an activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) there exists a causal connection between the two.  *Watkins v. Kasper*, 599 F.3d 791, 794 (7th Cir. 2010).  Whether an activity constitutes protected conduct under the First Amendment is an issue of law for the court.  *See Volkman v. Ryker*  736 F.3d 1084,

35

1091 (7th Cir. 2013).   With respect to the third element requiring a showing of causation, Gidarisingh must show that his "First Amendment activity was 'at least a motivating factor'" in each defendant's decision to take retaliatory action.   *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (quoting *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)).   If Gidarisingh makes this initial showing, then the burden shifts to defendants to demonstrate that they would have taken the same actions "even in the absence of protected conduct."   *Greene v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011).

*First*, Gidarisingh contends that his threat to file a grievance against Bittelman and others for denying him medical care was a motivating factor in the alleged physical attack by Bittelman, Rickey and Witterholt.   With respect to Rickey and Witterholt, Gidarisingh offers *no* evidence that these two defendants were aware of his threat to file a complaint against Bittelman and others earlier on the 23rd.   As such, there is no basis for finding any causal connection between Rickey and Witterholt's alleged role in the June 23rd physical incident and Gidarisingh's purported protected speech earlier that day.   *See Wackett v. City of Beaver Dam, Wis.*, 642 F.3d 578, 582 (7th Cir. 2011) (explaining that plaintiff "must prove defendants' knowledge of the protected speech to establish retaliation").

As for plaintiff's claim against Bittelman, the Seventh Circuit has questioned whether a threat to file a grievance can constitute protected conduct forming the basis of a First Amendment retaliation claim.   *See Bridges*, 557 F.3d at 555 ("But it seems implausible that a *threat* to file a grievance would itself constitute a First Amendment-protected grievance.") (emphasis in original).   Moreover, Gidarisingh does not dispute

36

that his statement to Bittelman that he was going to file a grievance occurred in the same exchange in which he called Bittelman a "racist honkey."  *See Ustrak v. Fairman*, 781 F.2d 573, 580 (7th Cir. 1986) (punishing an inmate for calling prison officers "stupid lazy assholes" did not violate the First Amendment).   In light of these particular circumstances, the court will reserve until trial on the issue of whether Gidarisingh's statement to Bittelman constitutes protected conduct under the First Amendment.[14]

*Second*, Gidarisingh alleges that defendants Valerius, Campbell, Neumaier, and Bittelman denied him medical treatment in retaliation for his complaints about the lack of care.  On June 25, July 5 and 6, 2012, Gidarisingh sent letters to the HSU supervisor complaining of Nurse Campbell's denial of medical treatment on the 23rd.  The latter two letters further indicated that his requests for care since then have been ignored.  In support of his claim that he was denied care, Gidarisingh appears to focus on defendants' false (according to plaintiff) representation that his refused an appointment on June 26.  In other words, Gidarisingh contends that these defendants (and Valerius in particular) lied about his refusal in an orchestrated effort to deny him care.   However, while Gidarisingh submitted these letters the day before, on June 25, 2012, there is *no* evidence that Valerius, Campbell, Neumaier, or Bittelman were aware of the complaints lodged in those letters at the time Valerius noted Gidarisingh had refused an appointment on the

---

[14] The retaliation claim against Bittelman also proves odd since the alleged retaliatory act in most cases, *could* be a legitimate act if taken for other reasons than retaliation.  Here, there is no legitimate basis for maliciously assaulting an inmate -- assuming Gidarisingh's account of the June 23rd incident were credited by the jury.   In light of this, Gidarisingh's claim against Bittelman seems better suited for review under the Eighth Amendment and the inclusion of a First Amendment claim would needlessly complicate the verdict at trial.

26th.  Accordingly, the court will deny Gidarisingh leave to proceed on this particular First Amendment claim.

*Third*, Gidarisingh contends that defendants Bittelman, Morgan, Ziegler, Douma, Casiana, Franson, and Hautamaki issued and adjudicated conduct reports all in retaliation for his complaining about denial of medical care and the June 23rd physical incident.  Gidarisingh again appears to focus on the June 25, 2012, letters to Meisner and Nickel, which triggered the DAI investigation.  Except for Bittelman, to find the other defendants liable, Gidarisingh would have to prove that they:  (1) knew Bittelman was lying about the June 23rd attack; and (2) nonetheless decided to issue a conduct report (Casiana), adjudicate him guilty (Morgan, Ziegler and Hautamaki), and affirm the disciplinary decision (Douma).  Because plaintiff has failed to put forth any evidence in support of a finding of this broad conspiracy, defendants will also be granted summary judgment on this claim.  *See Johnson v. Kingston,* 292 F. Supp. 2d 1146, 1158 (W.D. Wis. 2003) (explaining that plaintiff bears the burden to "adduce sufficient evidence at trial to allow a jury to find that defendants were motivated by a desire to retaliate against him").

## VI.   Renewed Motion for Assistance in Recruiting Counsel

Gidarisingh has also repeatedly sought assistance from this court in recruiting counsel for trial.  (Pl.'s Mots. (dkt. #5, 20, 25, 26, 60, 75, 92).)  In his sundry motions, he asserts two main grounds for trial counsel:  (1) his need for an expert witness to provide medical opinions; and (2) various short-comings, including limited knowledge of the law and mental illness.  On the first ground, having granted summary judgment to

38

defendants on plaintiff's deliberate indifference claims -- for reasons largely unrelated to whether his conditions constituted serious medical needs -- there is no need for medical expert testimony at trial.

Gidarisingh's second reason (or rather group of reasons), however, has more merit. Despite his lack of legal knowledge and mental illness, Gidarisingh's prosecution of his claims to date has been admirable.  Indeed, he far exceeds the average ability of inmates to press their claims, at least on paper.  While the court credits Gidarisingh's concerns about cross examining witnesses, the court finds no basis for finding that the challenges of trial exceed Gidarisingh's capacity.  Pruitt v. Mote, 503 F.3d 647, 655 (7th Cir. 2007) (en banc).  Still, the court agrees that Gidarisingh would be well served by trial counsel and will at least undertake the effort to recruit counsel for this purpose.


ORDER

IT IS ORDERED that:

1) defendants' motion for summary judgment (dkt. #37) is

   a) DENIED with respect to plaintiff's Eighth Amendment excessive force claim and state law battery claim against defendants Travis Bittelman, Kelly Rickey and Jason Witterholt, plaintiff's failure to protect claim against defendant Brian Franson, and plaintiff's Eighth Amendment conditions of confinement claims against defendants Kelly Rickey and Brian Franson;

   b) RESERVED with respect to plaintiff's First Amendment Retaliation claim against defendant Bittelman; and

   c) GRANTED in all other respects;

2) plaintiff's renewed motion for assistance in recruiting counsel (dkt. #75) is GRANTED; and

39

3)  all dates are SUSPENDED pending recruitment of trial counsel for plaintiff.

Entered this 25th day of February, 2015.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge